STATE OF CONNECTICUT *v.* WALTER DAVIS
(13291)

O'CONNELL, SPEAR and HENNESSY, Js.

Argued May 2—decision released August 1, 1995

*James P. Ginocchio,* assistant special public defender, with whom, on the brief, was *John Booth,* legal intern, for the appellant (defendant).

*Christopher T. Godialis,* deputy assistant state's attorney, with whom, on the brief, were *Eugene Callahan,* state's attorney, and *Robert Katz,* senior assistant state's attorney, for the appellee (state).

O'CONNELL, J. The defendant appeals from the judgment of conviction, after a jury trial, for sale of narcotics in violation of General Statutes § 21a-277 (a)[1] and sale of narcotics within 1500 feet of a school in violation of General Statutes § 21a-278a (b).[2] The defend-

[1] General Statutes § 21a-277 (a) provides in relevant part: "Any person who . . . sells . . . to another person . . . a narcotic substance . . . for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned . . . ."

[2] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section 21a-277 . . . by . . . selling . . . to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school . . . shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 . . . ."

ant claims that there was insufficient evidence to support either conviction. We reverse the judgment of the trial court.

The jury could reasonably have found the following facts. On April 12, 1993, Officer Richard S. Monroe, Jr., of the Norwalk police department was assigned to surveillance of possible drug activity in the area of Ely Avenue and Lowe Street in South Norwalk, a known drug trafficking area. He was located in an abandoned building 300 to 400 feet from the target area, watching the area through binoculars. Monroe was working with an arrest team of three officers that was waiting in an unmarked car out of sight of the target area.

Some fifteen minutes into the surveillance, Monroe observed the defendant standing in front of a laundromat on Ely Street. The defendant walked back and forth in front of the laundromat, stepping into the laundromat several times, and waved to several passing cars. A white Ford Escort came slowly down Ely Street. The defendant waved to the driver, a woman later identified as Laura James. She pulled into the parking lot adjacent to the laundromat and got out of her car.

James approached the defendant and handed him some currency. Monroe could not see the denomination. The defendant appeared to hand something back to James, but, because the defendant had his back to the officer, Monroe could not see the exchanges, whether one or more items changed hands, or whether the defendant took the item or items from his pocket, his coat or if he already had it in his hand. James put something in her coat pocket, walked back to her car and drove away.

Monroe radioed a description of the car and the direction it was traveling to the arrest team and continued to watch the laundromat. James was out of sight for

ten to fifteen seconds before the arrest team apprehended her. She was stopped at a traffic light, holding two "jumbos"[3] of what proved to be cocaine in her right hand, when the officers stopped their car behind hers and approached on foot. James was placed under arrest and given over to uniformed police for processing. She was not taken back to the laundromat to identify the defendant.

Five to ten minutes later, the arrest team arrived at the laundromat. Monroe radioed a description of the defendant to the arrest team, who entered the laundromat. They brought the defendant out and radioed Monroe, who told them that they had the right man.

The arrest team searched the laundromat and found several glassine envelopes of heroin hidden in some empty boxes,[4] but no cocaine. No drugs were found on the defendant's person. At trial, James denied buying the drugs from the defendant. We will discuss other relevant facts in our analysis.

When we review a challenge to the sufficiency of the evidence, we apply a two step analysis. "We must first review the evidence presented at trial, construing it in a light most favorable to sustaining the jury's verdict. We then determine whether, from the facts established and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Arbelo*, 37 Conn. App. 156, 159, 655 A.2d 263 (1995), citing *State* v. *Turner*, 24 Conn. App. 264, 267, 587 A.2d 1050, cert. denied, 218 Conn. 910, 591 A.2d 812 (1991).

---

[3] A jumbo is described as "the small corner of a sandwich baggie tied in a knot . . . mak[ing] a little . . . circle" containing drugs. Monroe testified that this amount sold on the street for $10 to $20.

[4] No one was charged in connection with the heroin. There were other people in the laundromat.

The first count charges the defendant with sale of a narcotic substance, specifically cocaine. "Sale," when applied to illegal drug transactions, is a much broader term than the common understanding of an exchange for value. The term includes "any form of delivery [of an illegal drug] which includes barter, exchange or gift . . . ." General Statutes § 21a-240 (50). Here, the state was required to prove beyond a reasonable doubt that the defendant sold, as that term is defined by statute, cocaine to James. *State* v. *Arbelo*, supra, 37 Conn. App. 160; *State* v. *Mierez*, 24 Conn. App. 543, 551, 590 A.2d 469, cert. denied, 219 Conn. 910, 911, 593 A.2d 136 (1991).

"A jury first draws inferences and makes findings of fact. In doing so, it may draw inferences from the facts it found proved, and it is not required to draw only inferences that are consistent with innocence. *State* v. *Tatum*, 194 Conn. 594, 598, 483 A.2d 1087 (1984). In drawing these inferences and finding these facts, however, it may not resort to speculation and conjecture. *State* v. *Mierez*, supra, [24 Conn. App.] 554.

"Once the jury has finished drawing inferences and making findings of fact, it must then determine its ultimate conclusion: whether those facts and inferences prove the defendant guilty beyond a reasonable doubt. 'Proof beyond a reasonable doubt requires that the evidence exclude every reasonable hypothesis of innocence.' *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994)." *State* v. *Arbelo*, supra, 37 Conn. App. 160.

The primary flaw in the state's case is that it offered no witness who saw drugs pass from the defendant to James. Furthermore, James testified that she bought the cocaine from a bald Hispanic man wearing eyeglasses. She was asked to come down from the witness stand and to approach the defendant; she denied that he was the man who had sold her the drugs. The defend-

ant is an African-American. There were Hispanic men in the laundromat, but none was detained or questioned.

The state's case was undermined further when no cocaine was found on the defendant's person or in the laundromat, nor did the defendant attempt to flee or resist when the officers entered the laundromat.[5]

Further weakening the state's case was testimony by Monroe that he saw two other men, whom he knew to be drug dealers, leave the laundromat and head in the same direction as James when she left the laundromat parking lot shortly thereafter. A member of the arrest team testified that a drug sale on the street can take as little as ten seconds. James was out of sight for at least that long. That officer also testified that it was not the usual practice for street dealers to flag down cars to make sales. He testified that street dealers normally ignored passing cars, reacting only when a driver in some way indicated an interest in buying drugs.

The state's reliance on *State* v. *Hall*, 165 Conn. 599, 345 A.2d 17 (1973), *State* v. *Bowens*, 24 Conn. App. 642, 591 A.2d 433, cert. denied, 220 Conn. 906, 593 A.2d 971 (1991), and *State* v. *Taylor*, 23 Conn. App. 426, 580 A.2d 1004 (1990), is misplaced.

In *Hall*, an undercover police officer made the buy while another undercover officer watched from about six feet away. The observing officer could not identify the item as it changed hands, but the buying officer gave the item directly to him, and he took it immediately to the police laboratory, where it tested to be heroin.[6] *State* v. *Hall*, supra, 165 Conn. 601–602.

---

[5] There was a connecting door in the common wall between the laundromat and the grocery store next-door.

[6] The buying officer died before the trial.

In *Bowens*, the drug sale took place in a dark alley and the surveilling officer could not see it. When the backup team apprehended the buyer, however, he had drugs in his possession and admitted having bought them from the defendant. When the officers approached the defendant, he fled, dropping envelopes of heroin similar to the one found in the buyer's car. *State* v. *Bowens*, supra, 24 Conn. App. 643–45.

In *Taylor*, the police saw a clear plastic bag change hands. When they stopped the buyer, he had a clear plastic bag of what proved to be cocaine and admitted to having just bought it from the defendant for $600. When the defendant was arrested, he had $601 in his pocket. *State* v. *Taylor*, supra, 23 Conn. App. 427. In each of these cases, the facts supported a reasonable inference that the item passed from the defendant to the buyer was, in fact, the drugs subsequently found in the buyer's possession. In the present case, the facts support only a speculation that that is what occurred.

*State* v. *Arbelo*, supra, 37 Conn. App. 156, is much closer to the facts of this case. In *Arbelo*, we reversed a conviction where the surveilling officer could not see what passed between the defendant and the alleged buyer. After the exchange took place, the observing officer watched the alleged buyer until he turned the corner, where he was arrested by the backup team. When stopped, the alleged buyer said, "Okay, you got me, it's in my vest pocket." Id., 159. The police retrieved a small packet of marijuana. The defendant was then arrested. He did not resist, and no drugs were found on him or hidden in the immediate area. The alleged buyer did not testify at trial and the source of the marijuana that he possessed was never established. Under these circumstances, it was not reasonable to exclude the hypothesis that the alleged buyer already had the marijuana before his brief contact with the defendant.

The present case against the defendant is weaker than that in *Arbelo*. In *Arbelo*, the alleged buyer did not testify; here the buyer testified and denied, both from the stand and face-to-face, that the defendant was the seller. In the face of this testimony, and with the dearth of direct or circumstantial evidence, "the factual existence of a drug transaction between [James] and the defendant rests on speculation and conjecture." Id., 161. There may be suspicion of drug activity between the defendant and James, but this is far from satisfying the state's burden of proving its case beyond a reasonable doubt. "The evidence does not exclude every reasonable hypothesis of innocence." Id., 162, citing *State* v. *Ford*, supra, 230 Conn. 693. Because the cumulative effect of the evidence does not support a finding of guilt on the first count, the second count also fails.

The judgment is reversed and the case is remanded with direction to render judgment of not guilty on both counts.

In this opinion the other judges concurred.